We have six cases before us today, four are scheduled for argument, and two are cases on the briefs. So let's start with the first case of this morning, it's 15-1362, Deacero S.A. v. United States. Mr. Serdlov, did I get your name right? Yes, you did, Your Honor. Thank you. Now, just to make sure, you're taking ten minutes, and Ms. Cannon, you're going to argue for three minutes, and you're reserving two minutes for your rebuttal, correct? I'd like to, yes, Your Honor. All right, you may proceed. Thank you very much. Good morning, Your Honors, and may it please the Court. We are here today because the trial court's opinion threatens to eliminate one of the tools that commerce has been given to fight circumvention of its orders. By holding that the prior commercial availability of a product can render that product immune from a minor alteration inquiry and preclude commerce from conducting that inquiry, the trial court created an improper threshold rule. That rule is contrary to the structure of the statute, it is nowhere to be found in the legislative history, and it usurps commerce's authority to develop the best methodology to determine how to implement the anti-dumping duty and countervailing duty statutes. Is it your position that the commercial availability factor is irrelevant, entirely irrelevant, to the minor alterations inquiry? Yes, it is, Your Honor. So, even if this product is being sold all over the place, it's just as common as, let's say, in the United States, and also produced and sold in the exporting countries, that would be irrelevant to the minor alterations. So I should clarify, Your Honor, our position is that the fact that a product is available itself is irrelevant. Now, there are other considerations that shade into the same area. So, for example, one of the things that commerce considers is the pattern of trade, how patterns of trade have changed after the imposition of an order. That may have elements of commercial availability to it, but in the minor alteration inquiry, commerce is fundamentally looking at, it's applying the five criteria that are stated in the legislative history, and it also uses some of its own criteria, such as how and when the merchandise entered the United States, the timing and quantity of entries during the relevant period. So, there are aspects of that inquiry that get captured, in the same way that there are aspects of inquiry that the trial court was so concerned about that get captured. What if we read the trade court's opinion as not based on some blanket rule of whether the merchandise was commercially available somewhere on the planet, but instead, the trade court imputed that knowledge to the petitioners, to commerce, and believed that he found indicia that, in fact, commerce was aware of and, therefore, was contemplating the existence of smaller diameter wire rod, and, therefore, it's reasonable for him to conclude that it was specifically excluded. So, I have three basic points, whatever that means. So then, the rule, such as it is, that the trade court was trying to create wasn't a any and all commercially available merchandise that existed at the time of the order, but it was more about, the question is, in what circumstances can we conclude that commerce fairly knew about it and was aware of it when it was crafting the scope of the order? So putting aside the fact that the record doesn't actually support finding that this product was available in the United States, or that it was being produced in Mexico at the time of the order, putting aside that fact, the trial court's finding still relies on the basic premise that, at the outset, in determining whether commerce can even conduct a minor alteration inquiry, we need to consider whether this product was excluded. And I would like to... When you say outset, is this the date of the filing of the petition? When I say outset, I mean at the outset of the analysis of whether commerce's determination was reasonable, because, remember, what happened here is that the court didn't consider commerce's weighing of the evidence. It stopped the analysis at, this product was commercially available, falls outside the literal scope of the order, therefore we can infer that it was deliberately excluded. And I would like to suggest that... Well, why don't you go ahead and... Thank you, Your Honor. I would like to suggest that the whole focus on exclusion actually sort of misses the point, because the whole point of a minor alterations inquiry, of an anti-circumvention inquiry, is that products that fall outside the scope of an order can be brought in, can be captured if they're being used to circumvent that order. Now the backstop to that, of course, is Wheatland. Wheatland is a unique factual circumstance in which sometimes it's just so clear that a product was known to petitioners at the time they asked for the order, was deliberately excluded that it makes no sense to even conduct a minor alteration inquiry. Let me just ask a hypothetical. Okay, so during the investigation, and there's a lot of letters being sent back and forth, although it doesn't appear in the scope of the order, the petitioners tell Commerce, we're aware that there is small diameter wire rod lower than 5 millimeters, but we don't care about those. What we care about is 5 to 19 millimeter wire rod. And then, of course, the scope order says 5 to 19. It doesn't specifically exclude, doesn't go further and say, and we specifically say not anything below 5. But you can tell during the investigation process the petitioners have made a proclamation that they don't care about things below 5. I think, would you say, would Commerce say that that would be an example of okay? We wouldn't think it's appropriate to use a minor alterations inquiry under those circumstances when the importer now shows up with 4.75 millimeter rod? No, your honor. I think the proper analysis in that case would be for Commerce to go through the minor alteration inquiry and weigh that, the kind of evidence. You wouldn't think it was disclaimed somehow during the process? I don't think the fact of disclaimer necessarily has to preclude Commerce from conducting a minor alteration. So in Woodland, the court found a disclaimer. Why don't you tell us the difference between what the court found in Wheatland, any disclaimer in Wheatland, and any disclaimer that the trade court found? So there are several critical differences between this case and Wheatland. The first is that in Wheatland, we were actually dealing with two separate products. We were dealing with different usages of different products and petitioners in the order. Standard pipe and long pipe? That's right. It's standard pipe versus line pipe. And during the investigation that led up to the imposition of the order, petitioners explicitly said, we're focusing on standard pipe. We're going to exclude line pipe. And only after they discovered that line pipe was actually then being used for the same purposes as standard pipe, they wanted to bring it back in. And this court, the other critical difference is that Wheatland doesn't say that Commerce can't conduct a minor alteration inquiry. Wheatland says it is reasonable for Commerce to decline to do so based on the unique and clear facts that are available to it. And this court in subsequent cases, in Nippon and in Target, has clarified the broad language of Wheatland, the broad language upon which the trial court principally relied in its exclusion analysis, to say that that language related to a scope inquiry, not a circumvention inquiry. And indeed, in a scope inquiry, it is appropriate to consider exclusion because scope can't reach products that are outside the unambiguous language of an order. The whole purpose of an anti-circumvention inquiry is to reach products that are outside the clear stated scope. And so in Nippon, this court overturned a trial court preliminary injunction preventing Commerce from conducting a minor alteration inquiry. And in fact, it did so in a circumstance where the parameters of the scope were also numerically defined. There was a numeric definition of percentage of boron content that could be in specified steel in the order. The article that was alleged to be a minor alteration exceeded those small percentages. Commerce believed that it was proper to conduct a minor alteration inquiry. In this case, it seems that the petition did have a specific exclusion, correct? It was a wire rod made out of certain alloys or bearing type steel and things of that nature. There were exclusions that were made in this case. There were exclusions for essentially other types of products. As Commerce found in its final determination in its IND memorandum, which the court confined it starting at, I apologize, starting at JA804, the nature of the product is determined by, the nature of the rod is determined by its chemical content, its ductility and all of those characteristics. So there are actually different types of products that are at issue. Size dictates also the type of the product. We can't establish class or kind of a product, correct? It can, but Commerce... The diameter of a rod? Theoretically, it could, Your Honor. But in this case, in its analysis, in its five-factor analysis, Commerce found that it did not because Commerce found that this was actually different diameter rods were essentially the same product. They had the same physical characteristics at JA812. Commerce makes these findings. There were the same user expectations, the same end use, same trade channels. The cost of modifying equipment to produce 4.75 millimeter rod as opposed to 5 millimeter rod or 5.5 millimeter rod was simply negligible. Does the record reflect where the 5 to 19 numbers come from? I am not... On this record, Your Honor, I can't off the top of my head point to where... There are a few places where 5.5, I think to 18.5 show up and presumably the 5 to 19 was intended to pick up manufacturing tolerances, but you don't have a particular source that we can look at and say, aha, there's a standard book of medium-sized wire rod and it is defined in a certain way. No, I'm not aware of an industry standard or anything like that. The trial court's opinion in Deocero I starting on JA33 discusses the history of the petition and what the facts show and what Commerce found in its initiation notice and it's an IND memo is that 5.5 millimeter rod was the smallest that was being produced in Mexico and imported into the United States at the time and the petitioners basically put a slightly larger bracket around that and said, this is the kind of rod that might injure us. Now, 4.75 millimeter rod, there's record evidence that it was being produced in Japan. Was there capacity in Mexico for production of 4.75 rod? It was not being produced at the time of the petition. No, I'm not asking if it's being produced. Was there capacity to produce it? What the record reflects, I don't know whether the record reflects... I thought the record reflected that they actually had to expend funds to retool to get to 4.75. There's something in the record to that effect, is there not? Yes, specifically Deocero. I don't know whether the country in general or whether other producers in the country... This producer. But I think it's also important to note that Commerce analyzed the cost of altering the machinery, the tooling to produce this smaller rod and it found that the percentage, the cost of doing so was minuscule. At JA3705, it's confidential data, but if the court looks to it, you can see that the percentage really is minuscule. Mr. Sverdlov, is there a rule, is there... I'm trying to figure out what your rule is for when it would be wrong or Commerce would be barred from doing a minor alterations inquiry. Could you change the facts of this case in a way that would then demonstrate why in that circumstance Commerce wouldn't work with a minor alterations inquiry? Or are you saying that there's never a circumstance where Commerce is barred from doing a minor alterations theory? I think our position is the latter, Your Honor, that Commerce can always initiate and conduct a minor alterations inquiry and where a product is just so clearly... Even if the scope of the order explicitly excludes something? It may be reasonable, as in Wheatland, and that's why I said earlier, Your Honor, that Wheatland is the backstop to this. In some cases, it's just so clear that Commerce doesn't have to initiate, but I don't think there's any precedent to support the notion that Commerce can actually conduct a five-part test and then have the analysis evaluated by the court based on the five factors that Commerce uses, the methodological factors that Commerce uses. I mean, in other words, I don't think there should be... So even if there's a specific and expressed disclaimer of a particular product, a particular, particular product in the scope of the order, that you would say, no, that doesn't count as a disclaimer that bars Commerce from doing a minor alterations inquiry later on? I think it would be reasonable for Commerce not to do a minor alterations inquiry and pursue into Wheatland. If the court were to extend Wheatland, then Commerce could be barred. But as it is, I am not aware of any law or any basis, any precedent, to suggest that Commerce is barred from even conducting an analysis. And you're urging us not to, as I hear you, not to adopt such a rule, I take it? That's precisely correct, Your Honor. The trial court's central error here is that it created a categorical rule that renders the minor alteration provision powerless against a whole class of merchandise. And we believe that is legal error and improper. Okay. You're well over your time by two minutes. I apologize, Your Honor. That's okay. We led you there with our questioning. Ms. Cannon, let's hear from you. Thank you, Your Honor. May it please the court, I'm Kathleen Cannon, representing domestic producers in this case. Let me first answer your question, Your Honor, about the specification. There are indeed industry specifications. They are ASTM specifications that apply to all steel products. They're on the record in the petition in the case. And those were the parameters that we, as petitioners, looked for when we defined the product. Wire rod was defined as a product that ranged from a 5.5 millimeter diameter upwards. And so we looked at that. We recognized some nominal changes that could be made. And we dropped the base to 5.0 millimeters because the petitioner's understanding that was the smallest wire rod that was being made or could be made. And 18.5 was the top. Exactly. So that was where the parameters came from. What do you mean when you say that was the smallest that could be made? I mean, the other side points to JA228, which is a page in your petition, your original petition, that block quotes an earlier report showing that, yes, the commercially significant smallest diameter was 5.5 millimeter diameter. But at the same time, that necessarily contemplates that there must have been something maybe commercially smaller, but nevertheless, something smaller than 5.5 millimeters. Yes, you're on. That's correct. But what was smaller was the range between 5.0 and 5.5. That was what was smaller. And that was why we dropped the range to 5.0. There's nothing that suggests anything was below 5.0, which is where we drew the base for the petition scope. Although that size was being produced in Japan at the time, I take it? Not to our knowledge. And that's the critical point. Well, wasn't there a finding by Commerce to that effect? Absolutely not, Your Honor. The finding by Commerce was that it was being produced, but not that we or they knew about it. Oh, I didn't ask about that. But it was being produced. It was being produced in Japan. A technical report came out. But that report was published two months after the order was issued in our case. So there's nothing of record on our case that at any time, either when we filed the petition or when we discussed the scope, that we or Commerce had any knowledge of that product's existence. So to read in from the facts of record as they existed at that time that we knew and deliberately excluded the product is incorrect. It was not a well-known product. So you're saying that you were aware of commercially available wire rod that was less than 5.5 millimeters, that was down to 5 millimeters, and then that's why the ultimate scope moved down from 5.5 to a bottom range of 5.0? Correct. Okay, because my understanding was it was more just about manufacturing tolerances. Exactly. Not that there was... That's true. But that was why we were dropping it to the 5.0, because we wanted to allow for that possibility. When you are a petitioner and you're defining a scope, you are trying to identify the products that are hurting you, that actually are being produced. You don't want to sweep in other products that aren't being produced or that you don't produce and that aren't injuring you. The whole goal of the case is to focus on what is causing harm, not to be overly broad and sweep in other products. That's part of the problem here is once you define that in a way that's actually focused on the product that's causing you harm and that Commerce and Customs can implement in an order, then to be told that now if somebody tweaks it slightly, and remember this tweak is 0.25 millimeters, that's the size of a grain of sand. A minor, minor change went to the same people, sold it to the same purposes, deprived of their business. That was what the minor alteration provision was assigned for. It seems to me that you can't... You can't allege that a certain size product is dumping if there's that product, if you have no evidence that it's being produced. Absolutely, Your Honor. There would be no way to do that. Okay. Thank you very much. Mr. Campbell. Good morning, Your Honors. May it please the Court. A product that is expressly and knowingly excluded from an order cannot later be found to be a minor alteration of subject merchandise. How is this expressly or knowingly excluded? What are you pointing at in the order? In terms of the express exclusion is clear in the very first line of the scope of the order. The scope was consciously defined by petitioners to limit subject merchandise to wire rod with a diameter of 5.00 millimeters up to 19.0 millimeters. That identifies the basis for the petition, but does it say that certain other types of product were excluded? It's an exclusion by definition, in the sense that if by necessity, if petitioners are limiting the subject merchandise to a precise diameter range, and the minimum diameter range is 5.00 millimeters, by definition, everything below that is excluded. And therefore, once you have, if you have a range in size, a range in weight, a range in tensile strength, any characterization such as that would necessarily mean you imply or you infer an exclusion of everything outside of the range, and there could be no amendment of the no minor alteration analysis. Is that your argument? The argument is that if a product is expressly and knowingly excluded. The next step in the argument that I heard you making was that the reason there is express exclusion is because you have a range. And once you have a range, everything outside of the range is foreboding for minor alterations. And are you saying that with respect to all characteristics of the described good? In this case, with respect, when there's such a clear diameter range, that's express. But our case is based on two factors. An express, which is based on the court's precedent in the plain language of the statute. An express exclusion based on a precise numeric diameter range and the petitioner's knowledge of the product that was being excluded. Let's look here. I mean, it seems to me that there was an express exclusion in this case. And that's, for example, a wire rod made out of certain alloys or bearing quality steel, or those were expressly excluded, correct? I mean, if you were to investigate and look at the petition and look at the class and kind determination and others, you would expect that that is expressly excluded. Well, Your Honor, the appellants argued that there is a list of specific products that are specifically excluded at the end of the order, such as tire bead quality wire rod and others. But, and the petitioner, the appellants... So would you call that an express exclusion? Yes, that is an express exclusion. But our exclusion is even clearer. The purpose of a list of products that are specifically excluded, those products are included in a list of products specifically excluded only because those products otherwise satisfy the scope definition. In our case, the very first line of the scope sets a clear minimum diameter to the hundredth of a millimeter. And it would be totally redundant. So explain how your argument is consistent with Wheatland. Actually, our facts are stronger than in Wheatland. In Wheatland, it involved an investigation that was brought against standard pipe. And the scope as defined by the petitioners in the investigation was unclear as to whether dual stenciled pipe, which is pipe that would satisfy both standard and line pipe specifications, would be subject or not. So Commerce requested that petitioners clarify. Petitioners clarified that no dual stenciled pipe is not subject to this case. And for that reason, when Commerce issued the order, it included dual stenciled pipe in the list of specific exclusions. In our case, it's clear from the very first line. Dual stenciled pipe, that was the line pipe? Yeah, dual stenciled to standard pipe and line pipe specifications. But in our case, the exclusion of small diameter wire rod, wire rod with diameters less than 5.00 millimeters, that's precise to a hundredth of a millimeter, is expressed and clear from the very first line of the scope defined by petitioners. But it says it gives you a range of diameter, but it doesn't say all other diameters above or below this range are hereby excluded. It doesn't have to. That would be perfectly redundant. Wouldn't that be the specific exclusion under Wheatland? I don't think Wheatland was... In Wheatland, the facts of the case involved a product that was listed as a specific exclusion at the bottom. But the point of Wheatland is that a product that is unequivocally excluded, knowingly, cannot be the subject of a minor alteration. And in our case, we don't have... The scope does not say in the list of products that are specifically excluded that wire rod with diameters less than 5.00 millimeters is specifically excluded. But to do so would be absurd and redundant because the very first line of the scope already makes crystal clear that subject merchandise is limited to wire rod within a precise numeric diameter range. And if petitioners had intended for the scope to include all ranges, all wire rod, they would not have included that numeric diameter range. And that diameter range would be meaningless. You said a moment ago, I think, that the petitioners... I may have misunderstood you, I think you said that petitioners knew about the existence of wire rod that was below the 5.0 millimeters. Ms. Cannon says that's not so. Can you point us to something in the record that supports your view on that factual question? Yes. There are a number of factors that establish, provide strong evidence of the petitioner's knowledge of small diameter wire rod, which I'm defining to mean wire rod with diameters less than 5.00 millimeters. First off is the fact that the first line of the scope itself, if they hadn't intended to... No, I don't want that kind of, one could infer from this that they must have type of evidence. I'm looking for something more concrete, such as a finding by Commerce or some specific evidence that you can point to that there was knowledge that Japan had such a product. Well, first of all, there was Commerce's first commercial availability finding. Commerce made that finding. As to the fact of commercial availability, but I didn't see anything in that finding as to the knowledge of the commercial availability in Japan. Well, it should be clear that if a product, small diameter wire rod is commercially available, these are US producers, they're sophisticated companies, they're in that industry, they have to know that it exists. So you're inferring knowledge. You don't really have any direct evidence of knowledge. Well, it's evidence of knowledge in the sense that there's more to it. There was also a US producer, Charter Rolling, that's in the record, that was making four millimeter wire rod as early as the 1990s. And then, of course, there's the Kawasaki report. That gets into confidential information, but I'm not sure that that evidence with respect to Rolling showed production at the time of the filing of the petition. Well, nevertheless, even if it didn't, petitioners had to have been aware that small diameter wire rod was capable of being produced. And despite that, they chose to limit the... Well, that's true, but they're bringing a dumping petition and they're obligated to support the petition with evidence. You can't file a dumping petition based on imaginary products or products that aren't there. That's incorrect, Your Honor. Petitioners have a wide latitude to define the scope as they please. And they often will include products... That's true, but they must supply evidence to support that scope. All they had to do was say, this product, this investigation covers wire rod. They did not do that. They made a conscious choice to limit the scope of subject merchandise to wire rod with a diameter of five millimeters up to 19 millimeters. And that was a conscious decision to exclude any wire rod outside... Why would they do that? Why not just say all steel? Because, well, they certainly couldn't bring a case against all steel. It has to be specific to a product. How can they bring a case against all wire rod? I mean, they're the ones that have to prove dumping and material injury. Well, Your Honor, it's common for petitioners to find... that is subject to ASTM specifications. And it's common for petitioners to define a scope to include products that are not... Even though certain products that would be covered by the scope might not be actually being manufactured by the U.S. producers or subject producers at the time. That's not uncommon. Petitioners will do that to protect themselves against circumvention. Ms. Cannon, again, I think referred... I believe it was Ms. Cannon who referred to the ASTM standards for this category of wire rod as being 5.5 to 18.5. Is that accurate? That is accurate. And what is that called in the ASTM? It's called the nominal diameter standard. The nominal standard is 5.5 up to 18.5. And below... Is there anything below that that has a category in terms of below that diameter? Not in the ASTM standard. But it was well known that a small diameter wire rod was capable of being produced. Even the ITC staff report... An ITC report that was relied on in the petition to help define wire rod acknowledged that wire rod in diameters less than the nominal 5.5 millimeters was commercially available. Is it your argument that once a petitioner, for example, sets a range that it's impossible to bring a minor alteration case against that range? For example, what if here we're talking about wire rod that's 4.998? And that's below 5. So under your argument, there's no way you could bring a petition or a minor alteration inquiry based on that, correct? That's not our position. Our position, which is based on the court's precedent in Wheatland and Nippon and the plain language of the statute, is that if a product cannot be subject to a minor alteration or cannot be found to be a minor alteration if it was both unequivocally excluded and was well known. In this case, we have both factors. Wire rod with diameters less than 5.00 millimeters is expressly and unequivocally excluded in the first line of the scope and the product was well known based on commerce itself found that it was commercially available. A U.S. producer was making it back in the 1990s. And according to the Kawasaki report that is on the record, Kawasaki Steel, a prominent Japanese producer... Was there evidence that the U.S. producer was making that rod at the time of the filing of the petition? I'm not aware of any evidence on the record or that would establish that, but Charter Rolling was making it back as early as 1990s. So there was clear knowledge on the part of the U.S. producers that small diameter wire rod was capable of being produced at a minimum and they nevertheless made a conscious choice to limit the scope of the subject merchandise to a precise diameter range. What evidence can you point the court where we would find commercial availability, meaning sold on the market, produced sold on the market, of 4.75 wire rod in the United States or in the subject countries? That would be the on the record. There is the evidence and we cite the sites are in our briefs that Charter Rolling was making wire rod down to four millimeters as early as the 1990s. I don't... Charter Rolling was not making... I don't think... I think the evidence shows that they were not producing this at the time of the filing of the petition. Do you have any other evidence you can point us to? I'm not aware of any, Your Honor, but it doesn't matter. Even if it were the case that no U.S. producer was making small diameter wire rod at the time of the petition, the fact that they knew it was capable of being made demonstrates their knowledge that they were limiting the scope of the subject merchandise to a certain diameter range with intent. That seems to me to really reduce to the test that Judge Rayner was referring to when he asked his question of you. The test being, if it's a range, there are no minor alterations because the only way this is going to come up is if somebody does, in fact, produce something that's outside of the range so we know they're capable of producing it. And the fact that they're capable of, according to your test, is enough to mean that range is it. You can't go beyond the range. That seems to me a range answers everything type inquiry. Isn't that really what your position is? Only if there's knowledge that it is capable of being produced. And here we have that. It's going to be a rare case, I suppose, in which somebody actually does produce something, say the 4.75, and you're not going to be in a position to say, of course, everybody knew it could be produced. Look, it is being produced and in large quantities. I just think that the category of cases that depart from the range is it rule is going to be essentially a null set. Well, Your Honor, the first line of the scope definitely establishes that range and that range does show a conscious decision to exclude everything outside that range. I mean, it's not as if petitioners are without a remedy. What they should have done is brought a new petition against a small diameter wire rod. There's a case, for example, on line pipe from Mexico in which the petitioners first brought a case against what they called large diameter line pipe and the outside diameter was 16 inches or more. And later, they brought another case against line pipe. So your argument is let's forget about 1677J and just file a new case. You don't have a basis for anti-circumvention case because anything can be produced. And if it's being circumvented, meaning a minor alteration or something that's later developed, tough luck. You didn't put it in your petition, thereby you excluded it. And you put it in your petition, you knew about it or should have known about it, bring another case. That's your argument. Well, according to the case law of Wheatland and Nippon and the plain language of the statute, that's the way it works. If a product is unequivocally excluded and well-known, it cannot later be the subject of a minor alteration inquiry. Well, let's get back to the trial court's decision. I think I heard you say that the trial court's decision is based on two factors, both of which are necessary components for the trial court to conclude there's no minor alteration inquiry allowed here. Number one, there's a specific range in the scope of the order. Number two, smaller diameter wire rod was known. And the trade court imputed that knowledge to the petitioners and to commerce for the trade court to conclude that commerce necessarily was contemplating the specific exclusion of that smaller diameter wire rod. Is that a fair reading of the trial court's decision? Well, the trial court. Can you first say yes or no? Is that a fair reading of the trial court's opinion? It had two factors. It found both factors, and it needed to find both those factors in order to bar commerce from doing a minor alterations inquiry. That's a fair reading, except that the court did not make any factual findings or impute knowledge. It just court basically first said commerce's original circumvention determination as it stood was unsupported by substantial evidence because commerce failed to account for the express exclusion of small diameter wire rod and its own commercial availability finding. Then on remand, commerce made the decision, went negative, and said there is no minor alteration. And the court affirmed commerce's negative remand determination as supported by substantial evidence because there was substantial evidence on the record to demonstrate that small diameter wire rod was excluded knowingly from the scope of the order. That second determination for commerce, they made it under protest, correct? That is correct. So they're saying we think otherwise, but you CIT ordered us, and therefore we're going to find this one. You're over your time by two minutes, and that's about how much they were over their time. I was going to give you two additional minutes. You already used them up, so thank you. OK. Thank you, Your Honor. OK. Mr. Furlog, you have two minutes. Thank you very much, Your Honor. I just have a few very brief points that I would like to make to clarify where we are. First of all, there is no evidence that US producers were making 4.75 millimeter rod at the time of the investigation. Moreover, there's no evidence that the subject countries that were subject to the investigation, and in particular Mexico, any producers in those countries were making 4.75 millimeter rod. And the evidence for that is at JA 136 and JA 73 to 74. The one bit of evidence that places commercial production of 4.75 millimeter rod even close to the order is the Japanese report, the Kawasaki report. That came out after the order was published. So it showed that in Japan, this rod was being produced commercially, but the report itself came out, I think, two or three months after the order was published. Now, moving on to the trial court's rule and essentially the rule advocated by D'Acero. The kind of reasoning that both the trial court and D'Acero use would essentially reduce minor alterations inquiries only to instances where the scope is ambiguous, where there is not a particular range or where a product was not commercially available. Now, what that would do is that would either merge the minor alteration inquiry with the later developed merchandise inquiry, or it would make the inquiry only available where the scope is ambiguous. Now, this court in Target explicitly rejected that argument. It explicitly rejected the argument that anti-circumvention proceedings are only available when the scope is ambiguous. The whole point of anti-circumvention is to capture articles that fall outside the literal terms of an order. That's what Wheatland itself recognized. And so the kind of focus that the trial court placed upon exclusion is improper in the first instance. It is certainly improper as a threshold criteria. It's nowhere to be found in the statute. It's nowhere to be found in the legislative history. Any closing thoughts? We respectfully ask that this court reverse the trial court's decision. Okay. Thank you very much. Thank you.